# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| PEARL RODRIGUEZ, on behalf of herself and all others similarly situated,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>HARTFORD FIRE INSURANCE COMPANY,<br><br>　　　　　　Defendant. | Civil Action No: 3:25-cv-972<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>**June 19, 2025** |

## CLASS ACTION COMPLAINT

Plaintiff Pearl Rodriguez ("Plaintiff"), on behalf of herself and all others similarly situated, hereby alleges against Defendant Hartford Fire Insurance Company ("Hartford Fire" or "Defendant") the following based upon her own knowledge, or where she lacks personal knowledge, upon information and belief, including the investigation of her counsel.

## NATURE OF THE ACTION

1.　　This class action arises out of Defendant Hartford Fire's uniform misconduct related to its failure to either pay or cause to be paid the full actual cash value ("Actual Cash Value" or "ACV") owed to Hartford Insurer Group[1] insureds, when it, acting as the claims administrator for the Hartford Insurer Group insurers, declares insureds' automobiles total losses and pay these total loss claims purportedly pursuant to standardized personal auto insurance policies issued by the Hartford Insurer Group insurers. The Hartford Insurer Group insurers have a common parent company, The Hartford Insurance Group, Inc. (formerly, The Hartford Financial Services Group,

---

[1] Defendant Hartford Fire and 20 other insurance companies that also write personal automobile insurance policies, are all insurers operating under "The Hartford" brand (collectively referred to as "The Hartford Insurer Group").

Inc).[2] Moreover, all or at least multiple of The Hartford Insurer Group insurers use the same claim administrator, Defendant Hartford Fire, to process and pay out total loss claims on their behalf from The Hartford Centralized Total Loss Center.  As such, they all use the same process and procedure to pay out claims pursuant to standardized auto policy provisions. The Hartford Insurer Group insurers, through the actions of their claims administrator, Defendant Hartford Fire, systematically breach their standardized personal auto policies with their insureds (including Plaintiff) as described more fully herein.

2.     For example, Defendant Hartford Fire acts as the claims administrator for at least two of The Hartford Insurer Group insurers: (1) Trumbull Insurance Company ("Trumbull"); and (2) Hartford Insurance Company of the Southeast ("Hartford Southeast"). Trumbull previously insured Plaintiff's car through a personal automobile insurance policy it issued. This car was deemed to be a total loss in June of 2020. Plaintiff's current car is insured by Hartford Southeast. Trumbull's and Hartford Southeast's standardized personal automobile insurance policies with Plaintiff and the other members of the Class (defined below), promise that, in the event of a "total loss" to an insured auto – where a vehicle cannot be repaired safely or it is considered economically impractical to repair –they will pay for the covered loss, limited to the ACV of the auto.  *See* the form policy issued to Plaintiff by Trumbull attached as Exhibit 1 at p. 14 of 31; *see also* the form

---

[2] The Hartford Financial Services Group, Inc. recently changed its name to The Hartford Insurance Group, Inc.  It began trading under the name "The Hartford Insurance Group, Inc." on the New York Stock Exchange on February 18, 2025. *See* https://newsroom.thehartford.com/newsroom-home/news-releases/news-releases-details/2025/The-Hartford-Unveils-Refreshed-Brand-With-Modernized-Stag-Logo/default.aspx#:~:text=In%20conjunction%20with%20the%20brand,%2C%20Inc.%2C%20on%20Feb; *see also* https://www.tipranks.com/news/company-announcements/hartford-financial-rebrands-to-hartford-insurance-group.

policy issued to Plaintiff by Hartford Southeast attached as Exhibit 4 at p. 12 of 15.[3] Trumbull's Limit of Liability provision in this policy is either identical to or materially the same as the Limit of Liability provision in the other standardized personal automobile policies it issues in at least 17 other states. Likewise, Harford Southeast has materially the same Limit of Liability provision as Trumbull in Harford Southeast's standardized personal automobile insurance policies issued in at least 22 states. Other Hartford Insurer Group insurers have materially identical Limit of Liability provisions in their standardized personal automobile policies issued throughout the United States.

    3.     Defendant Hartford Fire, on behalf of Trumbull, Hartford Southeast, and the other Hartford Insurer Group insurers. uses a third-party vendor, Mitchell International, Inc. ("Mitchell"), to determine the ACV of total loss autos by having Mitchell run "Vehicle Valuation Reports" (or "Report(s)") for each total loss claim. Defendant Hartford Fire, on behalf Trumbull, Hartford Southeast, and the other Hartford Insurer Group insurers, directs Mitchell as to the types of information to include on these Reports, including whether to apply Projected Sold Adjustments ("PSAs") to calculate the ACV owed for the total loss auto. Mitchell, via the direction of Defendant, systematically applies PSAs when running the Vehicle Valuation Reports, which results in a significant downward adjustment to the value of each comparable vehicle used in the Report to determine the ACV of the totaled auto. This, in turn, artificially reduces the ACV of the total loss auto and results in insureds failing to be paid the full ACV for their total losses as promised by the

---

[3] The Trumbull policy attached hereto as Exhibit 1 is the form policy Trumbull filed with the Illinois Department of Insurance via the System for State Electronic Rate and Form Filing ("SERFF"), with an effective date of August 2, 2005. *See* SERFF Filing # SERT-6CGLDA340. This is the only form personal automobile policy available for Trumbull in Illinois via SERFF. Upon information and belief, this policy was the policy issued to Plaintiff and other members of the Class who were issued Trumbull policies in Illinois. Similarly, the Hartford Southeast policy attached as Exhibit 4 is the form policy Hartford Southeast filed via SERFF, with an effective date of March 31, 2021. *See* SERFF Filing # HART-132609030. This is the only form personal automobile policy available for Hartford Southeast in Illinois via SERFF. Upon information and belief, this policy was the policy issued to Plaintiff and other members of the Class who were issued Hartford Southeast policies in Illinois.

policy. For Plaintiff, application of the PSAs to the comparable vehicles used in the Mitchell's Vehicle Valuation Report to calculate the ACV of her totaled auto resulted in her being paid roughly $437.60 less than the full ACV. In doing so, Defendant Hartford Fire systematically thumbs the scale when calculating the totaled autos' ACV in favor of The Hartford Insurer Group insurers for which it acts as claims administrator, resulting in Plaintiff's and other members of the Class's total loss claims being underpaid.

4.      The PSA reductions that Defendant Hartford Fire, on behalf of Trumbull, Hartford Southeast, and the other Hartford Insurer Group insurers, routinely applies and relies on are *per se* invalid and are arbitrary. They are not based on fact, they defy the used car industry's market pricing and inventory management practices, and they run contrary to appraisal standards. The only rationale provided for their use is a vague sentence buried inside the Vehicle Valuation Reports stating PSAs "reflect consumer purchasing behavior (negotiating a different price than the listed price)." *See* Exhibit 2 at p. 8 (Plaintiff's Vehicle Valuation Report).  This non-descript statement, which tells the consumer nothing about what specific, documented and verifiable data is being relied on to justify the PSA's use, is nothing more than a thinly veiled attempt by Defendant Hartford Fire to shirk its responsibilities in administering total loss claims for The Hartford Insurer Group insurers.  Indeed, The Hartford Insurer Group insurers are required to pay the full ACV owed to Plaintiff and other members of the Class under The Hartford Insurer Group insurer policies for which it administers total loss claims. Indeed, the PSAs applied assume, without exception, that all car buyers will negotiate the advertised list price down.  There is no data to support this wholesale downward adjustment, let alone the specific amount of the downward adjustment used. In fact, in the age of the Internet where comparison shopping is prevalent, and particularly during the height of the COVID-19 pandemic when Plaintiff's total loss occurred and during which used cars were being sold way above the advertised list price, used car dealers simply no longer readily

give buyers a discounted sales price from the advertised listed price.[4] Thus, the PSAs applied are

at-odds with market realities and run contrary to appraisal standards.[5]

---

[4] *See, e.g.,* https://www.coxautoinc.com/learning-center/2019-car-buyer-journey-study/ (2019 car buying study stating that more car buyers make car purchasing decisions using the Internet ahead of time, which requires dealers to "have a strategy to help buyers get to 'yes' online[]"); https://dealerservices.covideo.com/blog/no-haggle-car-buying/ ("For some buyers, the age-old tradition of negotiating their price at a dealership has begun to lose its luster. Consumers have a world of information at their fingertips paired with nearly unlimited online buying options, which has made them prioritize transparency . . . . No-haggle car buying reflects evolving consumer preferences and expectations in the automotive industry."); https://money.com/haggling-car-dealership-is-disappearing/ ("Overall, haggling at the car dealership has simply faded ever since supply shortages emerged in the auto industry in 2021. Car dealerships generally aren't under much pressure to move vehicles by offering discounts or engaging in negotiations with customers because their cars are still selling fast for around the full price or more."); https://www.forbes.com/sites/dalebuss/2021/09/21/online-creates-trust-in-car-dealers-by-young-consumers-study-says/ ("Young consumers are more likely to trust the auto-sales process the more that it moves online."); https://www.kbb.com/car-news/dealers-paying-more-for-used-cars-prices-likely-to-rise-again/ (used car prices increased by 27% over the calendar year in 2020); https://www.capitalone.com/cars/learn/finding-the-right-car/why-usedcar-prices-are-finally-dropping/2697 (explaining why the prices of used cars rose during the COVID-19 pandemic). *Cf.* https://www.digitaltrends.com/cars/harris-poll-survey-consumer-automotive-index-beepi-frustration/ (summarizing results of a 2016 study finding that "of parents with children under 18, 80 percent 'would rather do anything else unpleasant than negotiate with a dealership salesperson'")

[5] For example, the 2024 Uniform Standards of Professional Appraisal Practice ("USPAP"), which "represents the generally accepted and recognized standards of appraisal practice in the United States", *see* Exhibit 6, USPAP at p. vii, and which some automotive appraisal organizations recognize and follow, *see* https://autoappraisalnetwork.com/classic-car-valuation-tips/franchise-automobile-1525704014.html, requires appraisers to keep "all [] data, information and documentation necessary to support the appraiser's opinions and conclusions and to show compliance with USPAP, or references to the location(s) of such other data, information, and documentation" in the work file for each appraisal or appraisal review assignment. *See* Exhibit 6, USPAP, Record Keeping Rule, at p. 12. The USPAP also requires appraisers to generate reports that contain "sufficient information to allow the client and other intended users to understand the scope of the work performed" and prohibits them from "caus[ing] the assignment results to be biased" or allowing assignment conditions to cause assignment results that are not credible in the context of their intended use. *Id.*, Scope of Work Rule, at p. 16. With regard to personal property appraisals, such as appraisals of private passenger automobiles, the USPAP requires appraisers to "not commit a substantial error of omission or commission that significantly affects an appraisal", "not render appraisal services in a careless or negligent manner", and "identify, from sources the appraiser reasonably believes to be reliable, the characteristics of the property that are relevant to the type and definition of value and intended use of the appraisal". *Id.,* Standard Rules 7-1 and 7-2, at pp. 45-46. Specifically, "[i]n developing a personal property appraisal, an appraiser must

5.      Defendant's uniform practice of applying arbitrary and baseless PSAs to artificially reduce the value of the total loss auto results in insureds not being paid the full ACV for their total loss autos.

6.      As such, Plaintiff brings this class action on behalf of herself and all others similarly situated to recover damages resulting from Defendant Hartford Fire's failure to properly administer their first-party total loss claims, which cause The Hartford Insurer Group insurers to breach their policies with Plaintiff and the proposed Class (defined below).

7.      Plaintiff has already filed a related putative class action in this District, *Rodriguez v. Trumbull Ins. Co. et al.*, No. :24-cv-01993-VDO (D. Conn. 2025). That putative class action alleges a breach of contract claim against Trumbull concerning its conduct for failing to pay her the full ACV for her June 20, 2020 total loss claim and a declaratory judgment claim against her current insurer, Hartford Southeast, to declare use of PSAs to determine the ACV payment for first-party total loss claims to be unlawful. That lawsuit also alleges a negligence and tortious interference claim against John Does 1 through 21, who acted as the claims administrator(s) for Trumbull to adjust and pay Plaintiff's June 20, 2020 total loss claim and who currently acts as claims administrator for Plaintiff's current insurer, Hartford Southeast. Plaintiff files this lawsuit

---

collect, verify, and analyze all information necessary for credible assignment results" and "reconcile the quality and quantity of data available and analyzed within the approach or approaches used." *Id.,* Standard Rules 7-4 and 7-6, at pp. 47-48.  All personal property appraisal reports must "clearly and accurately set forth the appraisal in a manner that will not be misleading", "contain sufficient information to enable the intended user(s) of the appraisal to understand the report properly", and "summariz[e] the information analyzed and the reasoning that supports the analyses, opinions, and conclusions, including reconciliation of the data and approaches". *Id.,* Standard Rules 8-1 and 8-2, at pp. 49-50. The Vehicle Valuation Reports Trumbull and Hartford Southeast, through their claims administrator, Defendant Hartford Fire, direct Mitchell to generate do not state the data relied upon for use of PSAs and do not sufficiently explain the reason for the use of PSAs to the intended users (*i.e.*, the total loss claimants such as Plaintiff and other members of the Class). Accordingly, use of the PSAs in the manner applied here violates the USPAP. Similarly, use of PSAs is not expressly permitted by some states' appraisal of total loss laws. *See, e.g.,* Ill. Admin. Code tit. 50, § 919.80(c).

to preserve her legal claims against the claim administrator, Defendant Hartford Fire, for its role in causing Plaintiff and the other members of the Class to be underpaid for their total loss claims. Plaintiff only became aware that Defendant Hartford Fire was the claims administrator for Trumbull and Hartford Southeast after the filing of *Rodriguez v. Trumbull Ins. Co. et al.*, No. :24-cv-01993-VDO (D. Conn. 2025).

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because: (a) the Plaintiff is a member of the Class defined herein, which consists of at least 100 members, and she and the Defendant are citizens of different states; (b) the amount-in-controversy exceeds $5 million dollars exclusive of interest and costs; and (c) none of the § 1332 exceptions apply to the claims asserted herein.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the acts and course of conduct giving rise to the claims alleged occurred within the District. Indeed, Defendant was engaged in the business of marketing and selling personal auto policies in the State of Connecticut, within this District.  Also, Defendant has its principal place of business in Connecticut. As such, the Defendant is subject to personal jurisdiction in this District.

## THE PARTIES

10.     Plaintiff Pearl Rodriguez, at all times material hereto, is and has been a citizen of Illinois, residing in Hazel Crest, Illinois.  On June 20, 2020, Plaintiff's 2007 Ford Focus, which she insured through a personal automobile insurance policy issued by Trumbull, sustained physical damage in an accident.  Plaintiff filed a claim with Trumbull under the "Coverage for Damage to Your Auto" section of her Trumbull policy to compensate her for the damage to her car.  Defendant Hartford Fire, acting as Trumbull's claim administrator, determined her claim was covered under this section of the policy and declared Plaintiff's car a total loss.  Hartford Fire, either directly or indirectly, caused Trumbull to make a payment on Plaintiff's total loss claim under the Limit of

Liability provision of the "Coverage for Damage to Your Auto" section of her form policy, which provided, *inter alia*, for payment of the "[a]ctual cash value of the stolen or damaged property[.]" Exhibit 1 at p. 24. In calculating the payment for Plaintiff's total loss claim, Defendant Hartford Fire, acting as Trumbull's claim administrator, used the value for Plaintiff's total loss vehicle specified in a Mitchell's Vehicle Valuation Report to determine the ACV payment made to Plaintiff. This Vehicle Valuation Report applied PSA reductions to determine the value of Plaintiff's total loss vehicle. As a result, Trumbull's payment to Plaintiff for her total loss claim did not include payment of the full ACV for the totaled 2007 Ford Focus as was promised by her policy. Plaintiff provided all information and satisfied all conditions requested by Trumbull and Hartford Fire, as Trumbull's claims administrator, prior to the filing this lawsuit regarding the total loss of her 2007 Ford Focus.

11.    Plaintiff currently insures a 2019 Nissan Rogue under a personal auto insurance policy issued by Hartford Southeast. *See* Exhibit 4. This policy includes identical a Limits of Liability provision in its "Coverage for Damage to Your Auto" section to her Trumbull policy in effect at the time of the total loss of her 2007 Ford Focus. Upon information and belief, Defendant Hartford Fire, as Hartford Southeast's claim administrator, has and continues to direct Mitchell to apply PSA reductions to determine the value of the auto and then use that value as the basis to make a payment of ACV for covered total loss claims. As such, Plaintiff is concerned and has reason to believe that, if her 2019 Nissan Rogue is declared a total loss under her Hartford Southeast policy, Defendant Hartford Fire will again engage in its practice of applying arbitrary and baseless PSAs, resulting in the underpayment of total loss claims by not including the full ACV for the totaled auto as explicitly provided for in this policy.

12.    Defendant Hartford Fire is a wholly-owned subsidiary of The Hartford Insurance Group, Inc. Hartford Fire writes property and casualty lines of insurance, including personal automobile insurance policies like the ones issued to Plaintiff and the proposed Class (defined

herein), in all 50 states and the District of Columbia. Hartford Fire is licensed to conduct and is conducting business in all 50 states and the District of Columbia. Hartford Fire is a Connecticut company and maintains its principal place of business at One Hartford Plaza, Hartford, CT 06155. Hartford Fire shares this address with its parent, The Hartford Insurance Group, Inc., Trumbull, and Hartford Southeast. Defendant acted as Trumbull's claims administrator for Plaintiff's June 20, 2020 total loss claim. Defendant also acts as the claims administrator for total loss claims submitted to Hartford Southeast, Plaintiff's current insurer. Upon information and belief, Defendant also acts as the claims administrator for total loss claims submitted under personal automobile insurance policies issued by all or at least multiple other Hartford Insurer Group insurers.

### The Hartford Insurance Group, Inc. and All of its Subsidiaries Operate Collectively and In Coordination with Each Other Under the Brand Name "The Hartford"

13.    The Hartford Insurance Group, Inc. and all of its subsidiaries, including Defendant Hartford Fire, Trumbull, Hartford Southeast, as well as 17 other insurance companies that also write lines of property and casualty insurance, including personal automobile insurance policies, all operate under the brand name "The Hartford."[6] As such, The Hartford Insurance Group, Inc. and its subsidiaries all maintain the same website at https://www.thehartford.com. Through this website, all insureds, including Plaintiff and the members of the Class (defined herein), may access their online accounts related to their insurance policies underwritten by one of The Hartford entities.

---

[6] These other insurance companies include: First State Insurance Company, Hartford Accident and Indemnity Company, Hartford Casualty Insurance Company, Hartford Insurance Company of Illinois, Hartford Insurance Company of the Midwest, Hartford Lloyd's Insurance Company, Hartford Underwriters Insurance Company, Maxum Insurance Company, Maxum Indemnity Company, Navigators Insurance Company, Navigators Specialty Insurance Company, New England Insurance Company, Nutmeg Insurance Company, Pacific Insurance Company, Limited, Property and Casualty Insurance Company of Hartford, Sentinel Insurance Company, Ltd., and Twin City Fire Insurance Company. *See* https://www.thehartford.com/legal-notice.

14.     All employees of The Hartford Insurance Group, Inc. and its subsidiaries, including those Hartford Fire employee claims representatives that communicate with insureds regarding their total loss claims, have email addresses bearing a domain name of "thehartford.com".

15.     "The Hartford Centralized Total Loss Center" processes and administers all total loss claims submitted by insureds under their personal automobile insurance policies underwritten by any of The Hartford Insurer Group insurers.  All settlement statements sent to total loss claimants under policies underwritten by any of The Hartford Insurer Group insurers state as follows in the top left corner of the first page:



*See* Exhibit 3.  They are also signed by "The Hartford" claims representatives.  Upon information and belief, the "Toll Free Number" and the "Fax" number printed in the claims representative signature block on every settlement statement is the same for all total loss claims submitted to any of The Hartford Insurer Group insurers.

16.     Upon information and belief, Defendant Hartford Fire, through its employees, operates The Hartford Centralized Total Loss Center. As such, Hartford Fire acts as the claim administrator for all The Hartford Insurer Group insurers, including Trumbull and Hartford Southeast. As such, Hartford Fire engages in a common policy or practice of directing vendor Mitchell to apply PSA reductions when determining the value of a totaled auto, which, in turn, causes The Hartford Insurer Group insurers to pay less than the full ACV of the totaled auto as required by standardized personal automobile policies the insurers issue.

## FACTUAL ALLEGATIONS

I.    **DEFENDANT'S USE OF *PER SE* INVALID PROJECTED SOLD ADJUSTMENTS**

    **A.    The Standardized Auto Insurance Policy States The Company Will Pay the "Actual Cash Value" For Covered Total Loss Claims**

17.    Trumbull uses standardized personal automobile insurance policies to issue auto insurance to insureds in at least 18 states[7] known to Plaintiff as of the filing of this Complaint through publicly available state policy form filings (and as many as all 49 states where it is approved to sell personal automobile insurance policies).  This includes the policy it issued to Plaintiff in Illinois attached to this Complaint as Exhibit 1.

18.    Each standardized personal automobile insurance policy Trumbull issues contains a "Coverage for Damage to Your Auto" section.  This section outlines Trumbull's responsibilities regarding payment of loss claims submitted for physical damage lines of coverage, *i.e.*, collision coverage and "other than collision" coverage, commonly known in the auto insurance industry as comprehensive coverage and referred to herein as comprehensive coverage.  This includes payment of total loss claims.

19.    In this section, Trumbull contains a "Limit of Liability" provision, which applies to payment of all covered total loss claims.  This provision provides, in pertinent part:

**LIMIT OF LIABILITY**
A.    Our limit of liability for loss will be the lesser of the:
    1.    Actual cash value of the stolen or damaged property; or
    2.    Amount necessary to repair or replace the property with other property of like kind and quality.

Ex. 1 at p. 24 of 31.  All of the standardized personal automobile insurance policies Trumbull issues in at least the 18 states listed above contain this provision.  Upon information and belief, the other

---

[7]  These states are: Colorado, Connecticut, Delaware, Idaho, Illinois, Mississippi, Montana, Nebraska, New Mexico, North Dakota, Ohio, Pennsylvania, South Carolina, South Dakota, Texas, West Virginia, Wisconsin, and Wyoming.

Hartford Insurer Group insurers contain a materially identical Limit of Liability provision in the personal automobile insurance policies they issue.

20.     The Hartford Insurer Group insurers use the first option in this Limit of Liability provision when paying out **_all_** total loss claims.  Indeed, The Hartford Insurer Group's website states: "If you have collision and comprehensive coverage, your insurance company will pay you the actual cash value of your car if it's totaled."[8]  Consistent with that, the Settlement Statement provided to Plaintiff for her total loss claim states that Trumbull is purportedly paying the "Actual Cash Value" of her totaled auto less her deductible. *See* Exhibit 3.

21.     Accordingly, Trumbull's policies explicitly promise to pay the Actual Cash Value of the totaled car for covered total loss claims under the policies' "Coverage for Damage to Your Auto" section and its uniform practice is to pay the ACV for the totaled auto for covered total loss claims. Upon information and belief, so do the other The Hartford Insurer Group insurers' policies.

**B.  Defendant's Uniform Total Loss Settlement Process For Determining and Underpaying the Actual Cash Value of Totaled Autos for Covered Total Loss Claims**

22.     Despite the policy's promise to pay the Actual Cash Value of the totaled auto for covered total loss claims, the common and uniform total loss settlement process Trumbull and the other The Hartford Insurer Group insurers employ to pay these claims, through their claims administrator, Defendant Hartford Fire, causes Trumbull and the other The Hartford Insurer Group insurers to not pay the full ACV for covered total loss claims.

23.     Defendant Hartford Fire, on behalf of Trumbull and the other The Hartford Insurer Group insurers, uses a third-party vendor, Mitchell, to determine the Actual Cash Value of totaled autos.  Mitchell preforms "automated damage appraisal/vehicle valuation" of totaled autos for insurance companies that Mitchell claims "increase[s] efficiency", "decrease[s] the need for

---

[8] https://www.thehartford.com/aarp/car-insurance/total-loss-car-insurance.

adjuster involvement" and "pav[es] the way for a fully automated, end-to-end digital claims experience that supports both total loss and repairable vehicles".[9]  Defendant Hartford Fire, on behalf of Trumbull and the other The Hartford Insurer Group insurers, uses Mitchell to determine the Actual Cash Value of totaled autos by requesting that Mitchell prepare an "automated damage appraisal/vehicle valuation" and, in turn, Mitchell prepares a report called a Vehicle Valuation Report for the totaled auto.  Upon information and belief, Defendant Harford Fire makes all such requests on behalf of all The Hartford Insurer Group insurers because it administers all total loss claims submitted to these insurers, including those submitted to Trumbull, at The Hartford Centralized Total Loss Center.

24.     The Vehicle Valuation Report calculates the Actual Cash Value of a totaled auto by engaging in a five-part process.  First, the Report finds autos for sale that are similar to the totaled auto in the total loss claimant's geographic location.  These similar autos are called "comparable vehicles" in the Report.  Second, the Report takes the sales price listed for each comparable vehicle used and adjusts it either up or down based on three different adjustments to come up with an "adjusted price" for the totaled auto.  The first adjustment, called the mileage adjustment, is applied to account for documented differences in mileage between the comparable vehicle and the totaled auto.  The second adjustment, called an equipment adjustment, is applied to documented differences in trim options, accessories, and safety features offered by the comparable vehicle and the totaled auto.  The third adjustment, known as a PSA, is also applied.  However, unlike the mileage and equipment adjustments, the PSA is not based on any documented differences between the comparable vehicle and the totaled auto and its application consistently results in a downward adjustment to the amount of value of the total loss vehicle.  In fact, as discussed more fully below, Defendant Hartford Fire provides no clear rationale for applying the Projected Sold Adjustment to each comparable vehicle since this adjustment does not in any way account for actual differences

---

[9] https://hub.enlyte.com/m/7958b98ad2fe6cc/original/APDI-Total-Loss-Brochure-US.pdf

between the comparable vehicle and the totaled auto. Nonetheless, the mileage adjustment, equipment adjustment (if applicable), and the PSAs are factored together to create an "adjusted price" for each comparable vehicle, as depicted below:



*See* Exhibit 2 at p. 6.

25.    Fourth, after the Report creates an "adjusted price" for each comparable vehicle, the Report averages the adjusted prices to determine the base value for the totaled auto. From there, the Report then applies several other adjustments, collectively known as "loss vehicle adjustments", to the base value to calculate the "market value" for the totaled auto. On the first page of each Report, the "market value" is shown as being calculated in materially the same manner as follows:



*See* Exhibit 2 at p. 1.

26.    Defendant Hartford Fire, on behalf of Trumbull and the other The Hartford Insurer Group insurers, uses this "market value" generated by the Report and designate this figure as the "Actual Cash Value" of the totaled auto on the uniform written total loss settlement statements they

send to insureds.  Defendant's uniform written total loss settlement statements, sent via The Hartford Centralized Total Loss Center, provides the insured with an itemized breakdown of the settlement value for the totaled vehicle.  Thus, Defendant relies on the Report it directs Mitchell to generate to determine the ACV of insureds' totaled autos.  Defendant Hartford Fire even attaches the Report to the written total loss settlement statements it sends to insureds and states as follows: "To determine the 'Actual Cash Value' figure listed above, we reviewed available information, including the enclosed Vehicle Evaluation Report.  This report is one tool that we use to assist us in determining your vehicle's value . . . . The comparable vehicles identified from the database served as the basis for the value assigned in the Vehicle Evaluation Report, after accounting for differences on items such as mileage."  *See* Exhibit 3 at p. 1 (Plaintiff's written total loss settlement statement).

27.     As shown by the written settlement statement Plaintiff received from Hartford Fire and its employees via The Hartford Total Loss Settlement Center attached as Exhibit 3, the "Actual Cash Value" for her totaled 2007 Ford Focus matches the "market value" assigned by the Mitchell's Vehicle Valuation Report generated for this totaled auto:

| Plaintiff's Written Settlement Statement from The Hartford Centralized Total Loss Center | Plaintiff's Vehicle Valuation Report Generated By Mitchell | |
|---|---|---|
| Actual Cash Value: (+) $2,095.78<br>Sales Tax: (+) $0.00<br>Unrelated Prior Damage: (-) $0.00<br>Sub Total: $2,095.78<br>Total Fees: (+) $0.00<br>Deductible: (-) $500.00<br>Net Total: $1,595.78 | Loss Vehicle Adjustments<br>Adjustments specific to your vehicle | |
| | Base Value = | $2,215.17 |
| | Condition - | $194.39 |
| | Prior Damage | $0.00 |
| | Aftermarket Parts + | $75.00 |
| | Refurbishment | $0.00 |
| | Market Value = | $2,095.78 |

*Compare* Exhibit 3 at p. 1*, with* Exhibit 2 at p. 1.

28.    Plaintiff is not challenging application of mileage, equipment, or loss vehicle adjustments in this lawsuit because these adjustments align with used car marketing and inventory industry standards and account for differences that actually impact the value of an auto.  Indeed, it is common knowledge that an auto with less miles on it is more valuable than an auto with more miles on it, with everything else being equal. Similarly, an auto with additional accessories and/or safety features is more valuable than the same car without those accessories and/or safety features, with everything else being equal.  Additionally, having prior damage, aftermarket replacement parts, or refurbished parts on an auto makes the auto less valuable than an auto with no prior damage, aftermarket replacement parts, or refurbished parts, with everything else being equal.

29.    However, Plaintiff is challenging Defendant's use of PSAs as a matter of law to calculate the Actual Cash Value of the totaled auto because it is not based on documented differences between the comparable vehicle and totaled auto.  Significantly, application of PSAs appears to consistently result in a downward adjustment to each comparable auto.  This, in turn, results in claimants such as Plaintiff and members of the Class to not be paid the full ACV for the totaled auto as is promised by their policies.

30.    Stated differently, Defendant Hartford Fire and The Hartford Insurer Group insurers for which Defendant Hartford Fire administers claims, provide no data to justify its use of ***any*** PSA whatsoever, let alone the downward PSA reductions systematically applied in Plaintiff's and other members of the Class Vehicle Valuation Reports.  The ***only*** explanation for using PSA reductions is a vague statement buried in Plaintiff's Vehicle Valuation Report. Exhibit 2 at p. 8. It states in full: "Projected Sold Adjustment – an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price)." *Id.* This statement does not explain what verifiable and documented data is being used to consistently apply negative PSAs to reduce the value of the totaled auto, let alone the specific amount of downward adjustment used. Nor could they since the application of PSA reductions defy market realities as well as automobile dealer pricing and inventory management practices.

## C. The PSAs are Invalid, Arbitrary and Baseless

31.     PSAs are *per se* invalid because they assume that a consumer who is buying a car will negotiate the advertised price down so that the actual purchase price they pay is lower than the advertised price. This assumption is outdated and at odds with how consumers currently buy autos in the age of online shopping.

32.     Before the ubiquity of the Internet, advertised auto prices had very little to do with eliciting car buyers to a specific dealership.  Rather, car buyers typically went to their local used car dealership to purchase vehicles.[10]  At the time, they did not have a quick and easy way to comparison shop between dealerships to get the car they wanted for the lowest price. Lack of access to consumer resources that aided in comparison shopping among dealerships decreased competition,[11] allowing dealerships to set advertised prices without considering what their competitors were charging for a similar car.[12]

33.     As a result, dealerships generally set the advertised auto prices above market price knowing that some consumers might be poor negotiators and pay an inflated price for the car.  This, in turn, would result in the dealership realizing inflated profits from those sales.  However, the norm used to be that consumers and dealerships would haggle about the above-market advertised price,

---

[10] https://www.easterns.com/2021/04/16/buying-car-online-changed-auto-industry/#:~:text=Back%20in%20the%20pre%2Dinternet%20years%2C%20used%20car,suffered%20flood%20damage%20or%20was%20otherwise%20compromised.&text=Pre%2Dinternet%20car%20shopping%20usually%20meant%20driving%20around,town%20to%20find%20out%20about%20their%20selection.

[11] https://www.forbes.com/sites/forbesdallascouncil/2018/07/24/from-traditional-to-digital-how-the-internet-has-revolutionized-the-car-buying-process/.

[12] https://www.usatoday.com/story/money/cars/2012/12/06/car-shopping-prices-roundtable/1749101/.

typically resulting in a lower sales price.[13]

34.     In the age of the Internet, however, this is no longer how the used car market works. Now, consumers have access to extensive information about car sales across many different dealerships at their fingertips. This allows consumers to easily compare the advertised prices of similar vehicles.  Because consumers can more easily comparison shop, competition among dealerships increased and dealerships rarely, if ever, list advertised car prices above market.  If they did, consumers would simply choose another dealership to buy the car they want.  Instead, used car dealerships rely on sophisticated software to price their vehicles.  Reliance on such software causes used car dealerships to price their vehicles at market price.  As such, downward negotiations from the advertised price are no longer the norm.  Thus, use of PSAs to account for a routine "downward negotiation" of the advertised price of a vehicle no longer fits market norms or industry standards.[14]

---

[13] *Id. See also* https://dealerservices.covideo.com/blog/no-haggle-car-buying/ ("For some buyers, the age-old tradition of negotiating their price at a dealership has begun to lose its luster. Consumers have a world of information at their fingertips paired with nearly unlimited online buying options, which has made them prioritize transparency . . . . No-haggle car buying reflects evolving consumer preferences and expectations in the automotive industry."); https://money.com/haggling-car-dealership-is-disappearing/ ("Overall, haggling at the car dealership has simply faded ever since supply shortages emerged in the auto industry in 2021. Car dealerships generally aren't under much pressure to move vehicles by offering discounts or engaging in negotiations with customers because their cars are still selling fast for around the full price or more.").

[14] *See, e.g.,* https://www.coxautoinc.com/learning-center/2019-car-buyer-journey-study/ (2019 car buying study stating that more car buyers make car purchasing decisions using the Internet ahead of time, which requires dealers to "have a strategy to help buyers get to 'yes' online[]"); https://dealerservices.covideo.com/blog/no-haggle-car-buying/ ("For some buyers, the age-old tradition of negotiating their price at a dealership has begun to lose its luster. Consumers have a world of information at their fingertips paired with nearly unlimited online buying options, which has made them prioritize transparency . . . . No-haggle car buying reflects evolving consumer preferences and expectations in the automotive industry."); https://money.com/haggling-car-dealership-is-disappearing/ ("Overall, haggling at the car dealership has simply faded ever since supply shortages emerged in the auto industry in 2021. Car dealerships generally aren't under much pressure to move vehicles by offering discounts or engaging in negotiations with customers because their cars are still selling fast for around the full price or more."); https://www.forbes.com/sites/dalebuss/2021/09/21/online-creates-trust-in-car-dealers-by-young-consumers-study-says/ ("Young consumers are more likely to trust the auto-sales process the more

35.    This is especially true during the height of the COVID-19 pandemic when used cars were scarce and, as a result, dealerships routinely sold cars above the advertised price without any downward negotiation.  Indeed, during this time – when Plaintiff experienced her total loss –, consumers would frequently engage in bidding wars, resulting in dealerships being able to sell used cars well above their listed advertised price.[15]

36.    Inclusion of PSAs resulting in a significant downward adjustment to purportedly "reflect consumer purchasing behavior" is particularly improper when consumer-insureds like Plaintiff and the members of the Class experience total losses and need to replace their vehicles. They have limited time to search for a new-to-them replacement car that is offered in a below-market deal, which Defendant assumes without evidence, and contrary to market conditions, always exists.

37.    PSAs also contradict appraisal standards. Appraisal standards require adjustments to price to be based on documented and verifiable differences between the total loss auto and the comparable vehicle.  For example, the 2024 Uniform Standards of Professional Appraisal Practice ("USPAP"), which "represents the generally accepted and recognized standards of appraisal practice in the United States", *see* Exhibit 6, USPAP at p. vii, and which automotive appraisal organizations recognize and follow, *see e.g.,* https://autoappraisalnetwork.com/classic-car-valuation-tips/franchise-automobile-1525704014.html, requires appraisers to keep "all [] data,

---

that it moves online."). *Cf.* https://www.digitaltrends.com/cars/harris-poll-survey-consumer-automotive-index-beepi-frustration/ (summarizing results of a 2016 study finding that "of parents with children under 18, 80 percent 'would rather do anything else unpleasant than negotiate with a dealership salesperson.'").

[15] *See, e.g.,* https://web.archive.org/web/20240707053541/https://www.kbb.com/car-news/dealers-paying-more-for-used-cars-prices-likely-to-rise-again/ (used car prices increased by 27% over the calendar year in 2020); https://www.capitalone.com/cars/learn/finding-the-right-car/why-usedcar-prices-are-finally-dropping/2697 (explaining why the prices of used cars rose during the COVID-19 pandemic).

information and documentation necessary to support the appraiser's opinions and conclusions and to show compliance with USPAP, or references to the location(s) of such other data, information, and documentation" in the work file for each appraisal or appraisal review assignment. *See* Exhibit 6, USPAP, Record Keeping Rule, at p. 12. The USPAP also requires appraisers to generate reports that contain "sufficient information to allow the client and other intended users to understand the scope of the work performed" and prohibits them from "caus[ing] the assignment results to be biased" or allowing assignment conditions to cause assignment results that are not credible in the context of their intended use. *Id.*, Scope of Work Rule, at p. 16. With regard to personal property appraisals, such as of appraisals of private passenger automobiles, the USPAP requires appraisers to "not commit a substantial error of omission or commission that significantly affects an appraisal", "not render appraisal services in a careless or negligent manner", and "identify, from sources the appraiser reasonably believes to be reliable, the characteristics of the property that are relevant to the type and definition of value and intended use of the appraisal". *Id.,* Standard Rules 7-1 and 7-2, at pp. 45-46. Specifically, "[i]n developing a personal property appraisal, an appraiser must collect, verify, and analyze all information necessary for credible assignment results" and "reconcile the quality and quantity of data available and analyzed within the approach or approaches used." *Id.,* Standard Rules 7-4 and 7-6, at pp. 47-48. All personal property appraisal reports, among other things, must "clearly and accurately set forth the appraisal in a manner that will not be misleading", "contain sufficient information to enable the intended user(s) of the appraisal to understand the report properly", and "summariz[e] the information analyzed and the reasoning that supports the analyses, opinions, and conclusions, including reconciliation of the data and approaches". *Id.,* Standard Rules 8-1 and 8-2, at pp. 49-50. Moreover, all personal property appraisal reports must include a certification by the appraiser. *Id.,* Standard Rules 8-2(b)(xvi) and 8-3, at pp. 52-54. The Vehicle Valuation Reports Defendant Hartford Fire, on behalf of Trumbull,

20

Hartford Southeast, and the other The Hartford Insurer Group insurers, directs Mitchell to generate do not state the data relied upon for use of the PSAs, do not sufficiently explain the reason for the use of PSAs to the intended users (*i.e.*, the total loss claimants such as Plaintiff and other members of the Class) and are not certified. Accordingly, use of PSAs in the manner applied here violates the USPAP. Similarly, use of PSAs is not expressly permitted by some states' laws for appraising and determining the actual cash value of total loss vehicles. *See, e.g.,* Ill. Admin. Code tit. 50, § 919.80(c).

38.     Stated simply, the PSAs are based on undocumented and unverifiable assumptions, which as detailed above, are inconsistent with market realities and uniform appraisal standards.

39.     Defendant likewise thumbs the scale in favor of The Hartford Insurer Group, for which it acts as claims administrator, by systematically applying PSAs to reduce claim payouts to the detriment of the insureds by failing to account for variables that influence sales prices. For example, a consumer may trade-in the car as part of the sales transaction or purchase an extended warranty or service plan. These may reduce the ultimate sales price of a car because the consumer is providing the dealership with an additional benefit (*i.e.*, another car to sell or more money from the ancillary service plan sale) but would not impact the ACV of the car itself.

40.     Further, upon information and belief, until at least July 2021, Defendant Hartford Fire, through Mitchell, excluded from its data sets all comparable vehicles where the advertised list price of the vehicle equaled or was less than the sold price. Defendant only used data for comparable vehicles where the sold price was less than the advertised list price in the Vehicle Valuation Reports used to calculate the ACV of the total loss auto. In other words, Defendant, through Mitchell, used scraped and manipulated data in an attempt to justify applying PSAs to pay insureds less than ACV for their total loss autos.

41.    The impropriety, baselessness, and arbitrariness of Defendant's systematic application of PSAs is further demonstrated by the fact that Mitchell's primary competitor in providing Vehicle Valuation Reports to insurers – CCC Intelligent Solutions, Inc. – does not apply PSAs. Rather, CCC Intelligent Solutions, Inc. merely uses advertised list prices without application of PSAs to calculate the ACV of totaled autos. Yet, Defendant knowingly uses Mitchell to run the Vehicle Valuation Reports they rely on to artificially understate the ACV of insureds' totaled autos.

42.    Plaintiff and each member of the Class were damaged by Defendant's uniform and systematic use of PSAs. Specifically, Defendant did not pay, or caused The Hartford Insurer Group insurers, to not pay Plaintiff and the Class the ACV promised under their policies and the ACV they would have received had Defendant used proper appraisal standards and methodologies that reflect market realities to calculate the value of their totaled autos.

43.    Were it not for Defendant's use of these PSAs, the "base value" of each comparable vehicle used to determine the value of Plaintiff and each member of the Class would be higher, which would result in a higher "settlement value" and payment of the full ACV owed under the policies. Plaintiff's experiences highlight this fact and shed light on how The Hartford Insurer Group insurers and their claims administrator, Defendant Hartford Fire, wrongly pocket money owed to Plaintiff and other members of the Class under their policies.

**D.  Plaintiff's Experience**

44.    On June 20, 2020, Plaintiff Pearl Rodriguez's car was involved in an accident and sustained physical damage.

45.    Following the accident, Plaintiff made a property damage claim to her insurer, Trumbull.

46.    Trumbull and Hartford Fire, acting as Trumbull's claim administrator, declared Plaintiff's auto a total loss. Trumbull, and Hartford Fire, acting as Trumbull's claim administrator, provided her with a "Vehicle Valuation Report" generated from a third-party vendor, Mitchell,

attached as Exhibit 2. This Report does not comply with USPAP for all the reasons specified herein, including specifically as outlined in Paragraph 37 of this Complaint.  Nevertheless, Trumbull and Hartford Fire, acting as Trumbull's claim administrator, used this Report to determine the ACV for Plaintiff's totaled car, and, thus, the settlement payment amount to be paid under the terms of the policy for the totaled car.

47.     On Plaintiff's Report from Mitchell, the PSAs applied to each of five comparable cars used in the Report resulted in a downward adjustment of the "adjusted value" of each comparable vehicle by $525.00, $394.00, $460.00, $414.00, and $393.00, respectively. *See* Exhibit 2 at pp. 1, 3, 5-7. Defendant applied and relied on these figures to improperly conclude that the "market value" and, consequently, the ACV owed to Plaintiff was only $2,095.78. *Compare id., with* Exhibit 3.  After Plaintiff's deductible was subtracted from this ACV calculation in accord with her policy, Trumbull, through its claims administrator, Defendant Hartford Fire, paid Plaintiff $1,595.78 for her first-party total loss claim. Exhibit 3.  Other than the appraisal that was completed by Mitchell and is reflected in Plaintiff's Report from Mitchell (Exhibit 2), no demand for any other appraisal of Plaintiff's total loss vehicle was made prior to Plaintiff filing this lawsuit.

48.     Had Trumbull and its claims administrator, Defendant Hartford Fire, not applied or relied upon these improper PSA reductions, the ACV of Plaintiff's vehicle would be $437.60 higher.[16] This higher amount represents the full ACV Trumbull owes Plaintiff for her total loss claim under her policy.  These practices are not unique to Plaintiff's total loss claim since all total loss claims submitted to any The Hartford Insurer Group insurer purports to pay ACV for the total loss vehicle under the policy and is handled by Defendant Hartford Fire via The Hartford Centralized Total Loss Center.  Upon information and belief, Defendant employs the same practice and procedure to artificially reduce its total loss payments and cheat other members of the Class out of the money owed to them under their standardized policies.

---

[16] $437.60 is the average of the PSAs applied to the five comparable vehicles in the Vehicle Valuation Report Defendant Hartford Fire and Trumbull issued to Plaintiff.

## II.    DEFENDANT'S MISCONDUCT IS ONGOING

49.    Defendant uses and continues to use the uniform plan and practice, as described throughout this Complaint, that causes members of the Class's personal automobile policies to be routinely breached by their insurers. As a result, members of the Class do not receive the full monetary benefits of their auto policies.

50.    Plaintiff currently insures a 2019 Nissan Rogue under a personal auto insurance policy written by Hartford Southeast. *See* Exhibit 4 (Hartford Southeast Policy); Exhibit 5 (Plaintiff's current Hartford Southeast declarations page of policy).  This policy includes identical Limit of Liability provision in its "Coverage for Damage to Your Auto" section to the one in her Trumbull policy that was in effect at the time of the total loss of her 2007 Ford Focus.  *Compare* Exhibit 4 at p. 12 of 15, *with* Exhibit 1 at p. 24 of 31. Additionally, others insured by Hartford Southeast in at least 22 states based on the publicly available filings for polices (and as many as all 35 states in which Hartford Southeast issues personal automobile insurance policies) have identical or materially the same Limit of Liability provision in their policies.[17]

51.    Defendant Hartford Fire acts as Hartford Southeast's total loss claims administrator, and it continues to direct Mitchell to apply PSA reductions to determine the value of the auto and then use that value as the basis to make a payment for covered total loss claims.  As such, Plaintiff is concerned that, if her 2019 Nissan Rogue is declared a total loss under her Hartford Southeast policy, Defendant will again engage in their common scheme, which results in the underpayment of her and other Hartford Southeast insureds' total loss claims by not including the full ACV for the totaled auto as explicitly provided for in the form policies.

---

[17] These states are: Arkansas, Arizona, Illinois, Indiana, Louisiana, Maryland, Michigan, Minnesota, Missouri, Mississippi, Nebraska, New Mexico, Nevada, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Utah, Vermont, Washington, and West Virginia.

## CLASS ACTION ALLEGATIONS

52.    Plaintiff brings this action seeking certification of the Class, defined below, (the "Class") pursuant to Fed. R. Civ. P. 23(b)(1), (b)(2), (b)(3) and/or (c)(4), as may be deemed appropriate by the Court.

53.    Plaintiff brings this action, individually and on behalf of all other persons similarly situated, more specifically defined as follows:

> All persons insured by a personal automobile policy issued by a Hartford Insurer Group insurer in the United States, including TRUMBULL INSURANCE COMPANY ("Trumbull") and HARTFORD INSURANCE COMPANY OF THE SOUTHEAST ("Hartford Southeast"), that contains the same or materially the same policy provisions that the insurer will pay the Actual Cash Value for the stolen or damaged property (i.e., the auto), who, within the applicable statute of limitations, made a first-party claim to a Hartford Insurer Group insurer for a total loss of their covered auto under the policy's comprehensive or collision provisions, whose auto was declared a total loss, whose first-party loss claim was administered by HARTFORD FIRE INSURANCE COMPANY ("Hartford Fire") and where a Mitchell International Inc. Vehicle Valuation Report that applied Projected Sold Adjustments to determine the value of the auto declared a total loss was used by a Hartford Insurer Group insurer via its claims administrator Hartford Fire to determine the monetary amount it paid for the claim.

54.    Plaintiff reserves the right to modify or amend the definitions of any or all of the Class, including limiting the Class to multistate or statewide only, upon completion of discovery.

55.    Moreover, the Court can define the Class and create additional subclasses as may be necessary or desirable to adjudicate common issues and claims of the members of the Class if the need arises based on discovery of additional facts.

56.    Excluded from the Class are: (i) Defendant, its officers, employees, agents and affiliates, their subsidiaries, legal representatives, heirs, successors and assigns, (ii.) any of Plaintiff's counsel, their officers, employees, agents, legal representatives, heirs, successors, and assigns, (iii.) the judges assigned to this action and any of their immediate family members, and

(iv.) claims against a Hartford Insurer Group insurer that were released, settled or otherwise precluded by a final judgment in a class action filed in a state or federal court in the United States.

57.    **Numerosity.** The members of the Class are so numerous and are geographically dispersed throughout at least 18 states (but in as many as 50 states) in the United States such that joinder of all members is impracticable.

58.    The precise numbers of the members of the Class is unknown to Plaintiff at this time.  However, Plaintiff believes that, because at least two of The Hartford Insurer Group insurers for whom Hartford Fire administers total loss claims - Trumbull and Hartford Southeast - write millions of dollars of private-passenger physical damage coverage premiums each year in at least 18 and 22 states, respectively, the persons affected by Defendant's unlawful practices consists of thousands of individuals. Class members can be easily identified from Defendant's records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

59.    **Typicality.**  Plaintiff's claims are typical of those of the other members of the Class because (a) she insured an auto under a personal automobile insurance policy issued by The Hartford Insurer Group insurer Trumbull, which included comprehensive or collision coverages, (b) she made a loss claim for her auto under her insurance policy's comprehensive or collision coverage provisions, (c) her auto was declared a total loss as a result of making the loss claim, (d) her total loss claim was administered at "The Hartford Centralized Total Loss Center" by Hartford Fire and its employees, (d) Trumbull and its claims administrator, Hartford Fire, used a Mitchell Vehicle Valuation Report, in which PSAs were used to determine the value of her totaled car, and (e) application of the PSAs to determine the value of her totaled car resulted in Hartford Fire causing Trumbull to not pay her the full ACV of her totaled car in violation of the uniform provisions of the policy.

60.     Further, the material and relevant policy terms for each member of the Class are identical to or materially the same as the terms of Plaintiff's policy, as are the written settlement statements and Mitchell Vehicle Valuation Reports Defendant sent to Plaintiff and members of the Class.  As detailed above, Plaintiff's and members of the Class's legal claims arise from the same core circumstances, practices and conduct, namely, a form personal automobile insurance policy issued or administered by Defendant that expressly states Defendant will pay the ACV for the stolen or damaged auto as part of a loss claim submitted and approved pursuant to the policy's collision or comprehensive coverage provisions and the insurance company's subsequent failure to pay the full ACV for autos declared a total loss in accord with the policy provisions.  Plaintiff suffered the same common core harm as all the other members of the Class she seeks to represent. Accordingly, certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

61.     Plaintiff's interests are coincident with and not antagonistic to those of other members of the Class, nor is she subject to any unique defenses.

62.     **Adequacy.** Plaintiff and her counsel will fairly and adequately protect and represent the interests of each member of the Class. Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in prosecuting class actions and particularly insurance class actions on behalf of insureds. Plaintiff's counsel has successfully litigated other class action cases similar to the instant action: where insurers breached their contracts with insureds as part of total loss claim settlements by failing to pay the full amount of ACV for the total loss auto as required by the insurance contract.

63.     **Commonality and Predominance.**  Plaintiff's claims raise questions of law and fact common to all members of the Class, within the meaning of Fed. R. Civ. P. 23(a)(2), and they predominate over any questions affecting only individual members of the Class within the meaning

of Rule 23(b)(3).  The central issues in this litigation turn on interpretation of identical or materially similar policy provisions contained in standard form policy contracts and Defendant's systemic practice of using Vehicle Valuation Reports that apply PSAs to calculate the ACV of the totaled vehicle, resulting in  failure to pay the full ACV for the totaled cars as promised by the insurers' standard form policy contracts.  Thus, this case is well-suited for class-wide adjudication.  Said predominant common questions include, but are not limited to, the following:

(a) Whether the standardized form policies expressly issued to the Class by The Hartford Insurer Group insurers promise that the Limit of Liability for loss claims covered by the comprehensive or collision provisions of the policies to pay, *inter alia*, the Actual Cash Value of the stolen or damaged property;

(b) Whether Defendant, in paying Plaintiff's and members of the Class's total loss claims, used the value of Plaintiff's and members of the Class's total loss vehicles specified in Vehicle Valuation Reports that employed PSAs to determine the amount of the total loss vehicles' value;

(c) Whether the use of PSAs in the Vehicle Valuation Reports for Plaintiff's and members of the Class's total loss vehicles resulted in the amount of the total loss vehicles' value being lower than it would have been without the use of PSAs;

(d) Whether the use of PSAs to determine a total loss vehicle's value is valid and supportable;

(e) Whether application of PSAs to determine the amount Defendant caused to have paid to Plaintiff and members of the Class for their total loss vehicles' value constitutes a breach of their policy;

(f) Whether the PSA is baseless and invalid;

(g) Whether Hartford Fire administered Trumbull's total loss claims for Plaintiff and the Class members;

28

(h) Whether Hartford Fire administered other The Hartford Insurer Group insurers' total loss claims for Plaintiff and the Class members;

(i) Whether Hartford Fire tortiously interfered with Plaintiff's and Class members' contractual relationship with Trumbull and other The Harford Insurer Group insurers;

(j) Whether Hartford Fire acted negligently by using the PSAs to determine the Actual Cash Value of Plaintiff's and Class member's totaled vehicles; and

(k) Whether Plaintiff and the Class are entitled to compensatory damages.

64.    **Superiority.** Pursuant to Rule 23(b)(3), a class action is superior to the other available methods for a fair and efficient adjudication of the controversy because, among other reasons, it is desirable to concentrate the litigation of the members of the Class in one forum, as it will conserve party and judicial resources and facilitate the consistency of adjudications. Furthermore, because the damages suffered by individual members of the Class are relatively small, their interests in maintaining separate actions are questionable and the expense and burden of individual litigation makes it impracticable for members of the Class to seek individual redress for the wrongs done to them.  Plaintiff knows of no difficulty that would be encountered in the management of this case that would preclude its maintenance as a class action.  Indeed, the Class is readily definable, and the prosecution of this class action would reduce the possibility of repetitious litigation.

65.    The issues related to Plaintiff's claims do not vary from the issues relating to the claims of the other Class members such that a class action provides a more efficient vehicle to resolve this claim than through a myriad of separate lawsuits.

66.    Certification of the above Class is also supported by the following considerations:

a. The relatively small amount of damages that members of the Class have suffered on an individual basis would not justify the prosecution of separate lawsuits;

b.  Counsel in this class action is not aware of any previously filed litigation against the Defendant in which any of the members of the Class are a party and which any question of law or fact in the subject action can be adjudicated; and

    c. No difficulties would be encountered in the management of Plaintiff's claims on a class action basis, because the Class are readily definable and the prosecution of this class action would reduce the possibility of repetitious litigation.

67.    Defendant's unlawful practices in applying PSAs to the totaled auto, which results in an arbitrary and wrongful downward adjustment to the calculation of the ACV of the auto, despite the standardized personal auto policies explicitly stating that the full ACV will be paid for the total loss claim, are ongoing.  Injunctive relief and declaratory relief are necessary to stop these repeated and continued violations, which are likely to continue, repeat, and cause damages to the Class in the future.

68.    In the alternative, the Class may be certified pursuant to Fed. R. Civ. P. 23(b)(2) because adjudications with respect to individual class members would as a practical matter be dispositive of the other members of the Class given that their claims all emanate from a common provision in their standard form insurance policies, and the risk of inconsistent or varying adjudications with respect to individual class members would establish incompatible standards of conduct for Defendant with respect to whether failure to pay the full ACV for total loss autos is required by the common provisions of the standard form policies and Defendant's conduct in applying PSAs to total loss autos constitutes breaches of those common provisions of the standard form policies.

69.    Further, under Fed. R. Civ. P. 23(b)(1), prosecuting separate actions under these circumstances risks inconsistent or varying adjudications that could create incompatible standards of conduct for Defendant to follow, and/or adjudications for individual members of the Class that could be dispositive of unnamed class members' claims and may substantially impair or impede their ability to protect their interests.

70.    The action may alternatively be maintained as a class action with respect to particular issues, pursuant to Fed. R. Civ. P. 23(c)(4).

71.     All conditions precedent to suit have occurred or been performed.

## CAUSES OF ACTION

## COUNT I: NEGLIGENCE

72.     Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

73.     Plaintiff brings this count individually and on behalf of the other Class members against Defendant Hartford Fire.

74.     Defendant Hartford Fire is Trumbull's, Hartford Southeast's and the other Hartford Insurer Group insurers' claims administrator for total loss claims. As such, Hartford Fire owed Plaintiff and the other Class members a duty of care to process and administer their total loss claims with reasonable care and to act in conformance with the provisions of Plaintiff's and the other Class members standardized policies.

75.     Plaintiff's and the other Class members' personal automobile policies issued by Trumbull, Hartford Southeast, and upon information and belief, the other Hartford Insurer Group insurers promised to pay the full ACV for Plaintiff's and the Class members' approved total loss claims brought under the comprehensive and/or collision provisions of their policies.

76.     Hartford Fire processed, administered, approved and otherwise made payments to Plaintiff and the other Class members for their total loss claims brought under the comprehensive and/or collision provisions of their Hartford Insurer Group insurance policies.

77.     Hartford Fire breached its duties as the claims administrator for Plaintiff's and the other Class members' total loss claims and Trumbull's, Hartford Southeast's and the other Hartford Insurer Group insurers' duties owed to Plaintiff and the other Class members by authorizing or directing their third-party vendor, Mitchell, to apply arbitrary and baseless PSAs to calculate the value of Plaintiff's and the other Class members' totaled autos in the Vehicle Valuation Reports.

Application of the PSAs resulted in a significant downward adjustment to the value of each comparable vehicle used in the Report to determine the ACV of Plaintiff's and the Class members' totaled autos.  This, in turn, improperly reduced the ACV of Plaintiff's and other Class members' totaled autos.

78.    Hartford Fire also breached its duties as the claims administrator for Plaintiff's and the other Class members' total loss claims and  Trumbull's, Hartford Southeast's and the other Hartford Insurer Group insurers' duties owed to Plaintiff and other Class members by relying on the Vehicle Valuation Reports, which apply the arbitrary and baseless PSAs, to authorize or make payments to Plaintiff and the other Projected Sold Class members for their approved total loss claims that did not include payment for the full ACV of their totaled autos.

79.    Hartford Fire further breached its duties as the claims administrator for Plaintiff's and the other Class members' total loss claims and Trumbull's, Hartford Southeast's and the other Hartford Insurer Group insurers' duties owed to Plaintiff and the other Class members by providing them with written settlement statements and Vehicle Valuation Reports that inaccurately and misleadingly portrayed the amount of ACV owed to them by their Hartford Insurer Group insurer for their total loss claims. Indeed, the ACV stated in the written settlement statements and Vehicle Valuation Reports were based on application of the arbitrary and baseless PSAs as described throughout this Complaint. Hartford Fire then breached  as the claims administrator for Plaintiff's and the other Class members' total loss claims and Trumbull's, Hartford Southeast's and the other Hartford Insurer Group insurers' duties owed to Plaintiff and the other Class members duties by failing to correct the misleading or otherwise inaccurate written settlement statements and Vehicle Valuation Reports.

80.    As a direct and proximate result of Hartford Fire's breaches of the duties it owed to Plaintiff and other members of the Class as the claims administrator for their total loss claims and

Trumbull's, Hartford Southeast's and the other Hartford Insurer Group insurers' duties owed to Plaintiff and the other Class members, Plaintiff and the other members of the Class were systematically and substantially underpaid for their total loss claims. Accordingly, Hartford Fire's injured Plaintiff and the other members of the Class.

## **COUNT II: TORTIOUS INTERFERENCE WITH CONTRACT**

81.     Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

82.     Plaintiff brings this count individually and on behalf of the other Class members against Defendant Hartford Fire.

83.     Plaintiff and members of the Class all had valid standardized personal automobile policies issued by Trumbull or another Hartford Insurer Group insurer. Plaintiff and members of the Class all had an identical or materially similar provision, wherein the insurer expressly promised to pay the ACV, for the damaged or stolen auto if Plaintiff and Class members made a comprehensive or collision coverage loss claim under their policies and the claim was approved as a total loss.

84.     Plaintiff and members of the Class all made comprehensive or collision coverage loss claims under their policies with Trumbull or another Hartford Insurer Group insurer for their covered damaged or stolen auto that were declared under the policies to be a total loss and were each paid in money for the total loss claim by their insurer.

85.     Hartford Fire acted as the claim administrator for Plaintiff's and members of Class's total loss claims that Plaintiff and the other members of Class submitted to Trumbull or another Hartford Insurer Group insurer. Indeed, upon information and belief, all or at least most total loss claims submitted to a Hartford Insurer Group insurer are processed and administered at The Hartford Centralized Total Loss Center. The Hartford Centralized Total Loss Center is operated

by Hartford Fire and its employees. As such, Hartford Fire had knowledge of and were familiar with the standardized policies the Hartford Insurer Group insurers issued to Plaintiff and the Projected Sold Adjustment Claims Administrator Class members.  Hartford Fire was charged with administering the claims in accord with the express terms of the policies. Thus, Hartford Fire knew Plaintiff's and the other Class members' policies all contained an identical or materially identical express provision promising payment of the ACV for the damaged or stolen autos as part of a loss claim under the policy's comprehensive or collision coverages.

86.    Hartford Fire intentionally caused Plaintiff's and members of the Class's Hartford Insurer Group insurers to breach their policies with Plaintiff and the Class. Hartford Fire did so by directing third-party vendor, Mitchell, to systemically reduce total loss valuations by applying a Projected Sold Adjustment to determine the ACV of the totaled car. As Defendant knows, the Projected Sold Adjustment is invalid because it does not reflect market realities and runs counter to customary automobile dealer and inventory management practices.  Yet, Hartford Fire directed Mitchell to impose the Projected Sold Adjustment so that it artificially reduces the ACV calculation of the total loss auto. Hartford Fire then used this artificially reduced ACV calculation as the basis to pay Plaintiff and the Class for their total loss autos.  Engaging in this practice is unjustified because it resulted in Plaintiff and the Class receiving less than the ACV of the totaled auto in violation of their contracts with their Hartford Insurer Group insurer.

87.    As a result of Hartford Fire's conduct, Plaintiff and the Class did not receive the full benefit of their contracts with their insurers because the correct and full ACV was not paid as part of their total loss claim settlement.  Thus, Hartford Fire's conduct resulted in systematic and substantial underpayment of Plaintiff's and Class members' total loss claims and caused The Hartford Insurer Group insurers to breach their policies with Plaintiff and other members of the Class, all of which promise to pay the full ACV of the totaled auto. Thus, Plaintiff and the Class

have incurred damages in an amount to be proven at trial.

88.     Defendant Hartford Fire acted with actual malice in that it acted with a desire to underpay Plaintiff and the Class and deprive them of monies owed to them under their policies for their total loss claims.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and on behalf of the members of the Class requests an award, relief and entry of a judgment, as follows:

A.     An order certifying that this action is properly brought and may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure; that Plaintiff be appointed representative of the Class; and that Plaintiff's counsel be appointed counsel of the Class.

B.     Compensatory damages in an amount determined at trial.

C.     Punitive damages to the extent permitted by applicable law, in an amount determined at trial.

D.     An Order requiring an accounting for, and imposition of, a constructive trust upon all monies Defendant received as a result of the unlawful conduct alleged herein.

E.     An Order awarding Plaintiff her costs of suit, including pre- and post-judgment interest and attorneys' fees, to the extent they may be awarded for each Count.

F.     Such other and further relief as may be deemed necessary or appropriate for any of the claims asserted.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: June 19, 2025

FEINSTEIN DOYLE PAYNE
& KRAVEC, LLC

By:    /s/ Edward J. Feinstein
Edward J. Feinstein (CT31843)
Joseph N. Kravec, Jr., Esquire
(*Pro Hac Vice* to be filed)
Ruairi McDonnell, Esquire
(*Pro Hac Vice* to be filed)
Kaitlyn M. Burns, Esquire
(*Pro Hac Vice* to be filed)
29 Broadway, 24th Floor
New York, NY 10006-3205
Telephone: (212) 952-0014
Email: jkravec@fdpklaw.com
Email: rmcdonnell@fdpklaw.com
Email: kburns@fdpklaw.com

and

429 Fourth Avenue
Law & Finance Building, Suite 1300
Pittsburgh, PA 15219
Telephone: (412) 281-8400
Facsimile: (412) 281-1007

Antonio Vozzolo, Esquire
(*Pro Hac Vice* to be filed)
Andrea Clisura, Esquire
(*Pro Hac Vice* to be filed)
VOZZOLO LLC
499 Route 304
New City, New York 10956
Telephone: (201) 630-8820
Facsimile: (201) 604-8400
Email: avozzolo@vozzolo.com
Email: aclisura@vozzolo.com

and

345 Route 17 South
Upper Saddle River, New Jersey 07458
Telephone: (201) 630-8820
Facsimile: (201) 604-8400

Edmund A. Normand, Esquire
(*Pro Hac Vice* to be filed)
**NORMAND PLLC**
3165 McCrory Place, Suite 175
Orlando, FL 32803
Telephone: (407) 603-6031
Facsimile: (888) 974-2175
Email: ed@normandpllc.com

***Counsel for Plaintiff and the Proposed Class***